NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| COLLEEN P. FINNEGAN, | |
|---|---|
| *Plaintiff*, | Civil Action No. 14-7184 |
| v. | OPINION |
| MEDCO HEALTH SOLUTIONS, INC., et al., | |
| *Defendants*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

This matter comes before the Court on cross-motions for summary judgment filed by Plaintiff Colleen Finnegan and Defendants Medco Health Solutions, Inc. ("Medco") and Express Scripts Inc. ("Express Scripts") (together, "Defendants"). ECF Nos. 47, 56. For the reasons set forth below, Defendants' motion is **GRANTED**.

**I. BACKGROUND**

In 2007, Finnegan began working as a pharmacist for Medco. Pl.'s Statement of Undisputed Material Facts ("SMF") ¶ 1, ECF No. 53. On January 27, 2012, she went on medical leave due to a shoulder injury attributable to prior cancer surgeries. Id. ¶¶ 3-4. On July 27, 2012, she became eligible for long term disability ("LTD") insurance benefits. Defs.' SMF ¶ 9, ECF No. 48.

Finnegan received these benefits through Medco's Welfare Benefit Plan (the "Medco Plan"), a plan she participated in for several years by the time she left on disability. Id. ¶ 2; Pl.'s SMF ¶ 13; Finnegan Dep. dated April 29, 2016 ("Finnegan April 2016 Dep.") 59:10-60:3. The Medco Plan, for which Medco was the plan sponsor and administrator, offered several different kinds of benefits. In addition to LTD benefits, the Medco Plan offered a life insurance program

(the "Medco Life Insurance Program"). Id. ¶ 3; Pl.'s SMF ¶¶ 9-10. The Medco Life Insurance Program provided eligible employees like Finnegan with company-paid life insurance coverage for 1.5 times annual base salary, though Finnegan always opted for extra coverage. Defs.' SMF ¶ 3; Finnegan Decl. ¶¶ 5-6, ECF No. 55. The Prudential Insurance Company of America ("Prudential") was the carrier for the policy. Defs.' SMF ¶ 5.

Under the Medco Life Insurance Program, employees who received LTD benefits could receive "no-cost" life insurance coverage. The Summary Plan Description ("SPD") states:

> **If You Are Receiving LTD Benefits**
>
> If you begin receiving LTD benefits, Basic Life and Basic AD&D Insurance coverages in effect on the date you become (or became) eligible for LTD benefits will continue at no cost to you.
>
> Any Optional Life or Optional AD&D Insurance coverages for you or your dependents in effect on the date you become (or became) eligible for LTD benefits will continue at your same employee contribution rate.

Spraguer Decl. Ex. 1, SPD at 9, ECF No. 49-1. In order to receive this no-cost coverage, the employee had to meet certain requirements. The employee had to "provide proof to Prudential that you have become totally disabled and have remained totally disabled for six months, provided that the total disability commenced while you were insured and before age 65. Your coverage will continue uninterrupted while you remain totally disabled up to age 70, provided you provide proof of your continued disability annually to Prudential." Id. Finnegan does not claim that she ever applied for or received no-cost insurance while employed by Medco.

The following page of the SPD explained that the coverage was not indefinite. Under a bolded heading titled "**When Coverage Ends**," the SPD explained that the employee's "coverage and participation in the Group Life and AD&D Insurance Program ends on the earliest of the . . . Saturday coincident with or following the date your employment with the Company ends

2

(including termination while on an approved leave of absence) . . . ." Id. at 10. The SPD also provided that Medco could amend the Medco Plan "in whole or in part" or "completely discontinue" it "at any time." Id. at ii.

Around the same time Finnegan's LTD benefits began, Medco completed a merger with Express Scripts. Defs.' SMF ¶ 7. Under the terms of the merger, Medco would terminate the Medco Plan at the end of the year, along with its insurance policies and its carrier relationship with Prudential. Id. ¶¶ 14, 16. Medco's plan participants would stay on the Medco Plan until it expired in December 2012, then transition in January 2013 to Express Scripts' welfare benefits plan ("Express Scripts Plan"). Id. ¶¶ 8, 14. Express Scripts was the plan administrator for its Plan. See Spraguer Decl. Ex. 4, Express Scripts Plan, Art. I, § 1.08, ECF No. 49-4; id. Ex. 5, Amendment to Express Scripts Plan § 1(a), ECF No. 49-5.

The Express Scripts Plan had its own benefits guide ("ESI Benefits Guide"). See Spraguer Decl Ex. 6, Benefits Guide at 0029[1], ECF No. 49-6. The ESI Benefits Guide stated that its life insurance carrier was Minnesota Life. Defs.' SMF ¶ 21. The Minnesota Life insurance policy ("Minnesota Life Policy") did not have a no-cost option for LTD employees like the Medco Plan's did. See Spraguer Decl. Ex. 10, Minnesota Life Policy, ECF No. 49-10. But like the Medco Plan, coverage under the Minnesota Life Policy ends when the employee is terminated. It explained that the insured's coverage ends on "the date the employee no longer meets the eligibility requirements," and that the insured becomes ineligible "due to termination of employment." See Minnesota Life Policy 009, 0010. The Minnesota Life Policy also said that the terminated employee had 31 days to convert his or her group policy to an individual policy. Id. 0010.

---

[1] Because many documents contain unreadable pagination, the Court will pin cite to bates stamps instead of actual page numbers where necessary.

The parties dispute whether Finnegan received the Express Scripts Benefits Guide. Finnegan claims that she did not remember receiving the Benefits Guide before the change-over to the Express Scripts Plan in January 2013. See Pyrich Decl. Ex. 4, Dep. of Colleen Finnegan dated April 19, 2016 ("Finnegan April 2016 Dep.") 75:2-12, ECF Nos. 54-4, 64-1.

Medco claims that she did receive the Benefits Guide and, in fact, she used it make elections under the Express Scripts Plan for the 2013 plan year. In support, Medco notes that the Express Scripts' Benefits Guide explains that annual enrollment occurred in November 2012, see Benefits Guide at 0015, and that Finnegan testified that she recalls annual enrollment occurring around that time, see Finnegan April 2016 Dep. 75:16-23. Then, Medco points to what purports to be screen shots of Finnegan's Express Scripts Plan enrollment activity in November 2012. See Spraguer Decl. Ex. 7, Finnegan 2013 Annual Enrollment Activity Timeline and Enrolled Subscriber Coverages ("Enrollment Activity"), ECF No. 49-7. The screen shots, which purportedly contain notes of Finnegan's conversations with an Express Scripts representative, state that Finnegan "processed elections" on November 7; called the next day to "verify why the prices are different on the booklet and on [the online] portal"; made changes to her elections on November 13; and called again on November 16, when a representative "[w]alked [her] thru Enrollment [sic]," and she confirmed her elections. Enrollment Activity at 0044-0046.[2] Finnegan does not recall these conversations but admits that they possibly happened. Finnegan April 2016 Dep. 88:16-89:9.

On December 31, 2012, the Medco Plan ended, and Finnegan and the other eligible Medco employees became eligible to join the Express Scripts Plan the next day. Defs.' SMF ¶ 18.

---

[2] Defendants submitted an affidavit explaining that they maintained these notes as business records. See Spraguer Decl. ¶¶ 24-25; see also Fed. R. Evid. 803(6). And Finnegan does not object to the Court's consideration of the exhibit.

Four months later, on April 10, 2013, Express Scripts terminated Finnegan because the office she was affiliated with closed. Id. ¶ 25; Finnegan April Dep. 72:11-25. "At some point" after that, she received a COBRA notice ("COBRA Notice") dated May 10, 2013. Finnegan Decl. ¶ 18; id. Ex A, COBRA Notice, ECF No. 55-1. The COBRA Notice reiterated the Minnesota Life Policy's end-of-coverage and conversion rules. It stated, "your coverage under the Plan will end on 04/13/2013 due to End of Employment . . . ." COBRA Notice 1. It also said she could convert her group term life insurance coverage to private coverage: "If . . . your coverage has terminated you may be able to convert your group term life insurance coverage and pay premiums directly to Minnesota Life. You have 31 days from your benefit end date to complete a conversion application. Please contact Minnesota Life at 1-866-293-6047 to request the conversion forms." Id. 2; Finnegan April 2016 Dep. 136:22-137:9.

Finnegan claims that she did not understand the COBRA Notice for two reasons. Finnegan Decl. ¶ 20. First, she claims that she did not understand why COBRA offered her the option to buy insurance given that the she believed Medco Plan's 2012 SPD promised her no-cost insurance. Id. ¶ 21. Second, she claims that she had cognitive issues due to "side effects from [her] ongoing medical treatments." Id. ¶ 20.

On some unspecified date, she tried to contact human resources at both Medco and Express Scripts but did not receive a response. Id. ¶ 22.

On June 10, 2013, Finnegan called Minnesota Life. Id. ¶ 23. During the call, Finnegan said that she received a notice about continuing her life insurance. Spraguer Decl. Ex. 9, Call Logs at 0441, ECF No. 49-9. The Minnesota Life representative confirmed that she could change her coverage, and said she could convert her $600,000 of coverage under the group policy to the same coverage under a personal policy for $3,837.25 per quarter. Finn. Decl. ¶ 24; E-mail dated April

5

16, 2014 at 0441, ECF No. 49-9. Finnegan replied, "I can honestly say that isn't going to happen." Call Log at 0441; see also Finnegan Decl. ¶ 25; Dep. of Colleen Finnegan dated May 12, 2016 ("Finnegan May 2016 Dep.") 29:21-30:8, Pyrich Decl. Ex. 5, ECF No. 54-5. She laughed when she heard the amount because it was "a little too high to be able to afford." Finnegan April 2016 Dep. 142:17-143:2. In her eyes, conversion "was not financially feasible with [those] numbers," because "it was beyond [her] financial means to convert the policy . . . ." Id. 144:10-14, 144:17-21. In a subsequent declaration submitted with her summary judgment motion, Finnegan claimed that the amount was "unnecessarily high" since she believed she had no-cost coverage under the Medco Plan. Finnegan Decl. ¶ 25.

There are conflicting statements in Finnegan's deposition as to what happened next. On one hand she claims that, at some point that summer (without saying when), she requested plan documents from Express Scripts but did not receive a response. Finnegan May 2016 Dep. 21:22-22:6. On the other hand, she says that she spoke to Jaime Conley, an Express Scripts human resources employee, who sent her the Minnesota Life Plan. Id. 23:13-:24:5; Finnegan April 2016 Dep. 154:24-155:12.

In any event, the timeline reconnects in September 2013. On September 3, Finnegan called Minnesota Life again. During that call, she said "her husband 'sort of' works in the field and he said most companies have a provision where there is a waiver of premiums and continuation of the life Insurance policy if the person is long-term disabled." Call Log at 0441. The Minnesota Life representative said Finnegan would have to discuss that with Express Scripts. The representative asked "if she had continued her coverage with us after her employment terminated. She said 'no' because when she called they told her it was $3,837 every three months . . . ." Id. Finnegan then said "she's since learned that the majority of companies had [the no-cost] provision

6

so she wasn't sure if that was something Express Scripts should have continued on her behalf." Id. The representative "explained she had 31 days following her termination to apply and that she wouldn't be able to continue her coverage with Express Scripts since that time frame had passed. Again, [the representative] referred her back to Express Scripts." Id.

After that call, Finnegan spoke to Conley at Express Scripts again. Finnegan Decl. ¶¶ 33-34. In an e-mail dated September 14, 2013, Finnegan thanked Conley for getting the Minnesota Life plan to her, and added "[a]s my husband looked at it, he thought I might need the Medco Plan that I would have been covered under at the time of my disability . . . I am assuming it was Medco (and not Express plan) that I would have been covered under in late January 2012. Please let me know." Id. Ex. B, E-mails dated September 2013 between Finnegan and Express Scripts at 130, ECF No. 55-2. On September 19, Conley wrote to Jayne Hensley, an Express Scripts benefits consultant, saying that Finnegan "inquired as to whether she would be covered by [the Express Scripts] policies or previous Medco Policies? She went out on [leave of absence] in early 2012 and was terminated in April 2013. Thoughts?" Id. Hensley, who replied the same day, sent Conley the Medco SPD from 2012 and said, "I am not sure what she is looking for so in 2012 it would be the Medco policy with Prudential." Id. at 0129. Later that day, Conley forwarded the Medco SPD to Finnegan. Id.

Though not in the e-mails, Finnegan says that Conley also told her to submit an application for no-cost insurance to Prudential. Finnegan Decl. ¶ 35. On October 1, 2013, Finnegan prepared an application for Prudential and e-mailed it to Conley to add employer information. Id. ¶ 36; id. Ex D, E-mails dated October 2013 between Finnegan and Conley at 131, ECF. No. 55-4.[3] Conley

---

[3] Finnegan says that she e-mailed the application to Conley in "early September." Finnegan Decl. ¶ 38. But the e-mail, which she attached to her declaration, is dated October 1 and says she sent

7

returned the completed application to Finnegan a month later, and she sent it to Prudential. Finnegan Decl. ¶ 38.

In June 2014, Prudential denied Finnegan's request for no-cost insurance. Id. ¶ 40. Prudential denied the claim because its contract with Medco ended in January 2013. Id.

Meanwhile, Finnegan explained her post-employment attempts to replace the coverage she had under the group policy. Sometime in fall 2013—i.e., after the chance to convert to a private Minnesota Life policy passed—she tried to buy increased coverage on a policy she had since graduate school, but the company refused to sell it because they deemed her "a bad health risk." Id. ¶ 43. In 2014, she received a new life insurance policy from Prudential with $250,000 coverage through age 65 for $1,800 per year (or $150 per month). Id. ¶ 47. In 2015 and 2016, she worked with brokers to find more coverage, but they were unsuccessful. Id. ¶¶ 44-45. In March 2016, she bought a $150,000 policy from Fidelity for $200 per month, which begins covering her in 2019. Id. ¶ 48. In sum, since Finnegan left the company, she has been able to replace $400,000 of the $750,000 she had under the Medco Plan. Id. ¶ 46.

Finnegan sued Medco, Express Scripts, and Prudential under section 404 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104, for breaches of their fiduciary duties. She asserts five causes of action, only four of which concern Medco and Express Scripts. In Counts One, Two, and Four, she claims that Medco and Express Scripts breached their duty because they: (1) did not disclose that Minnesota Life replaced Prudential as the insurance carrier, "so that [she] could send her application to the appropriate carrier in order to have her free life insurance benefit reinstated," Compl. ¶¶ 54-55; (2) referred her to Prudential "and took no

---

the application to Conley that morning. Id. Ex. D, E-mail dated Oct. 1, 2013 at 131-32, ECF. No. 55-4.

steps to rectify the problem [when] Prudential denied [her] application to have her free life insurance benefit reinstated," id. ¶¶ 61-63; and (3) failed to monitor Prudential's supposedly erroneous denial, id. ¶ 75. In Count Five, she asserts an ERISA section 405 claim, 29 U.S.C. § 1105(a)(1), on the ground that Medco, Express Scripts, and Prudential are liable for each other's fiduciary breaches. Compl. ¶¶ 81-88.[4]

## II. LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

## III. ANALYSIS

The ERISA section that governs fiduciary duties, section 404(a), sets out the standard of care for fiduciaries. 29 U.S.C. § 1104(a). It requires that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the

---

[4] In Count Three, which is only against Prudential, Finnegan claims that Prudential breached its duty because it "did not have authority to deny Plaintiff's claim for free life insurance benefits on the basis that Prudential's services had been terminated as of January 1, 2013." Id. ¶ 68.

Finnegan also asserted a sixth cause of action for retaliation under ERISA section 510, 29 U.S.C. § 1140. She now concedes the claim and "does not contest the entry of judgment in Defendants' favor solely to" that count. Finn. Opp'n Br. at 11 n.5, ECF No. 62.

> care, skill, prudence, and diligence then prevailing that a prudent
> man acting in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of a like character and with like
> aims.

29 U.S.C. § 1104(a)(1)(B). Based on this provision, a "fiduciary may not, in the performance of [its] duties, 'materially mislead those to whom the duties of loyalty and prudence are owed.'" In re Unisys Corp. Retiree Med. Benefits ERISA Litig., 579 F.3d 220, 228 (3d Cir. 2009) (Unisys IV) (quoting Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000)) (additional citation omitted). A fiduciary also has a corresponding affirmative duty to speak "when the trustee knows that silence might be harmful." Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000) (quoting Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993)).

In order to prevail on a breach of fiduciary duty claim under ERISA, a plaintiff must establish that: "(1) the defendant was acting in a fiduciary capacity; (2) the defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure." Unisys IV, 579 F.3d at 228 (quotations and citations omitted).

The parties dispute all four elements. The Court need not address the many arguments raised under each element, however, because the Court finds that there was no detrimental reliance here.

In demonstrating reliance, the plaintiff must have taken some action as a result of the misrepresentation or omission; the mere expectation of a continued benefit is not enough. Shook v. Avaya Inc., 625 F.3d 69, 73 (3d Cir. 2010) (citations omitted). Detrimental reliance can occur in many ways. It often manifests as an employee's voluntary decision to retire, but it can also

"encompass decisions to decline other employment opportunities, to forego the opportunity to purchase supplemental health insurance, or other important financial decisions pertaining to retirement" or benefits under a plan. Unisys IV, 579 F.3d at 229; Shook, 625 F.3d at 73-74. "[A]bsent any evidence that [the plaintiff] was harmed as a result of not having [accurate] information," there is no violation. See Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 462 (3d Cir. 2003).

Finnegan contends that she detrimentally relied on Medco and Express Script's misrepresentations and omissions about the availability of no-cost insurance in three ways: (1) she lost out on no-cost insurance under the Medco Plan after her termination, (2) she did not convert her Minnesota Life group policy to a personal one, and (3) she spent several months pursuing illusory no-cost insurance "in lieu of any other options," which resulting in her buying worse coverage. Compl. ¶¶ 55, 63, 75; Finn. Br. at 22, ECF No. 56-1; Finn. Reply Br. at 15, ECF No. 74.[5] None of these amounts to detrimental reliance.

The gravamen of the first issue is that Express Scripts and Medco made mistakes after Finnegan was fired, like telling her to send an application to Prudential and not disclosing that her coverage ended when she was terminated, and those mistakes caused her to miss out on no-cost insurance.

This theory is based on a false premise. It assumes that Medco and Express Scripts' post-termination misstatements or omissions caused Finnegan to miss out on no-cost insurance. They did not. The Medco Plan, which contained the no-cost provision, expired several months before

---

[5] Of these three harms, only the first is set out in the Complaint. See Compl. ¶¶ 55, 63, 75. Though the Court need not reach the new theories because they were not asserted in the Complaint, the Court will explain why they also fail. Horvath v. Keystone Health Plan E., Inc., 333 F.3d 450, 459 (3d Cir. 2003) (finding new theory "fails at the most basic level because it finds no support in the plain language of [the] complaint.").

11

she was fired in April 2013, and the Express Scripts Plan that replaced it did not contain any similar no-cost option. Moreover, regardless of whether the Medco Plan or ESI Plan was active in April 2013, neither one provided life insurance coverage after her termination. See Medco SPD at 10; see also Minnesota Life Policy at 009-010 (ending coverage at termination too). Since she had no right to no-cost insurance after she left the company under either policy, she could not have been harmed by any misrepresentations or omissions by Medco or Express Scripts.[6]

Finnegan responds that a reasonable person could read the Medco SPD to mean that "continued employment was not a condition for receiving the benefit." Finn. Reply 2 (emphasis removed). She claims that the Medco SPD says that no-cost insurance is available as long as certain requirements are met—i.e., receipt of LTD benefits, disability that occurred before 65, total disability lasting 6 months, proof of disability, and coverage up to age 70—and none of them mention staying with the company. The Court disagrees. At the outset, this argument does not account for the fact that the Medco Plan was no longer active, or that Medco had the right to discontinue the Medco Plan at any time. See Medco SPD ii. Even so, her argument fails because it is not supported by the plain language of the Medco SPD. The requirements for no-cost insurance cannot be read in isolation. Rather, "[i]n determining the actual terms of the plan,

---

[6] As the Court reads it, Finnegan's claim concerns missed coverage after she was terminated only, not missed coverage when she was still employed. In other words, she is not claiming that she would have applied for no-cost insurance when she was still employed, but Medco and Express Scripts did something that prevented her from applying then. Nothing in the Complaint, summary judgment record, or briefs discusses such a theory. Cf. Compl. ¶ 34 ("Medco and/or Express Scripts failed to inform Plaintiff that even though she was terminated from her employment, she had the right to continue her free life insurance benefit pursuant to the Plan"), ¶ 40 ("[W]hen Plaintiff corresponded with Express Scripts and/or Medco to have her free life insurance benefit reinstated, no one informed Plaintiff that Prudential was no longer the current life insurance carrier, nor did anyone inform Plaintiff the name of the current life insurance carrier."); Finnegan Br. 2 ("Over the course of 2013 and 2014, Colleen had numerous conversations with Medco/Express Scripts Human Resources in an effort to take advantage of the 'premium waiver' coverage she believed existed . . . ."), ECF No. 56-1.

ERISA plans, like contracts, are to be construed as a whole." Kemmerer v. ICI Americas Inc., 70 F.3d 281, 288 (3d Cir. 1995) (citation and quotes omitted).

When reading the Plan as a whole, there are two reasons why Finnegan's construction fails. First, her reading is does not align with the rest of the no-cost subsection. There are two main clauses in the subsection. The first states, "If you begin receiving LTD benefits, Basic Life and Basic AD&D Insurance coverage in effect on the date you become (or became) eligible for LTD benefits will continue at no cost to you." Medco Plan at 9. The second states, "You must also provide proof to Prudential that you have become totally disabled and have remained totally disabled for six months, provided that the total disability commenced while you were insured and before age 65. Your coverage will continue uninterrupted while you remain totally disabled up to age 70, provided you provide proof of your continued disability annually to Prudential." Id. These two clauses have different roles. The first sentence explains a potential benefit, i.e., Medco will pay a participant's life insurance premiums. The second sentence merely explains how the participant can obtain that benefit (e.g., be disabled for 6 months before turnings 65) and the outer limits of the benefit (i.e., cannot receive the benefit pasts 70). Finnegan, however, argues that the second clause simultaneously plays two roles. She argues that it both explains how the participant can obtain the benefit *and* confers an additional benefit. That is, she reads it as a promise to offer Basic Life and Basic AD&D Insurance coverage at no cost until the person turns 70, no matter what. But that makes little sense. For one, it would be strange to read the second clause as wearing two hats, especially where the first sentence already explains the benefit offered in the subsection. And second, it would create an unalterable, or vested, right to life insurance at no cost. For example, it would require Prudential to cover a participant's life insurance, and require Medco to pay for it, even if the participant was otherwise no longer eligible for coverage under the Plan.

13

Such vesting of benefits "is not to be inferred lightly and must be stated in clear and express language." Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co., 188 F.3d 130, 139 (3d Cir. 1999) (citations omitted). No such clear and express language appears in the section.

That brings us to the second, related reason why her reading fails. Her reading ignores the end-of-coverage explanation on the next page. If, as Finnegan suggests, the no-cost section grants her an unalterable right to no-cost insurance until she is 70 no matter what, then that section cannot be squared with the unambiguous language that all insurance coverage ends when a participant is terminated. And the end-of-coverage section does not use qualifying language to suggest it is subject to any exceptions, let alone a substantial one like vested coverage until 70. As such, her argument is unpersuasive. Rather, there is only one logical reading of these two passages: the no-cost option applies to any disabled *employee* but expires when the employee turns 70; but it does not apply to *former employees* that have since left the company, since former employees are no longer covered under the Plan. Based on this reading, Finnegan's argument that former employees can receive no-cost insurance fails.

That is not to say Medco and Express Scripts are not complicit in Finnegan's misunderstanding that she could get no-cost insurance after her termination. Viewed in her favor, the evidence suggests that Conley and Hensley added to the confusion. When Finnegan told them she was curious about the no-cost option from the Medco Plan, neither Conley nor Hensley corrected her misunderstanding. Instead, they forwarded her the Medco Plan, which they knew was expired, to look for a coverage option that they should have known was only available to active employees, not fired ones. Then they told her to apply to Prudential. But these facts alone do not amount to a breach of fiduciary duty. She must show that she would have received no-cost

14

insurance after she was fired but for these mistakes. Since none of the plans offered coverage after she was fired, she was not harmed by missing out on what was never there to begin with.

That brings us to the remaining two harms—missing out on the Minnesota Life individual policy, and missing out on "other options" while ending up with only $400,000 of coverage instead of $750,000. These theories could amount to a breach because, unlike the no-cost option, they were at least theoretically available to her after she was fired. See Smith v. Hartford Ins. Grp., 6 F.3d 131, 137-40 (3d Cir. 1993) (finding reasonable jury could conclude that, absent employer's misrepresentations, employee could have converted her group policy into individual policy). The question then is why she missed these options. That is, there must be some nexus between the misstatements or omissions and these harms. The Court finds that there is not.

First, the Minnesota Life conversion option. Finnegan argues, "[b]elieving that she had the ability to obtain employer-paid life insurance for as long as she was disabled through age 70, Colleen made the important financial decision to reject the option of continuing her life insurance through Minnesota Life as too expensive." Finnegan Reply 14. Her argument is unavailing. The undisputed evidence shows that she did not rely on the existence of no-cost insurance when turning down the conversion option.

Finnegan had 31 days from the day her coverage ended to convert her Minnesota Life group policy to an individual policy. She must show that, during that time period, Medco or Express Scripts gave her incorrect information, or knew about but failed to correct her belief that no-cost insurance was available. She has not done so. She does not identify any interactions with them in the window of time she had to make the conversion. According to the Cobra Notice that she admits she received, her coverage ended on April 13, 2013 and she had 31 days to convert her policy. So her window of time expired sometime in mid-May 2013. But the first time she mentions

the no-cost policy to Conley was in her September 17, 2013 e-mail when she asked him for the 2012 Medco Plan. Assuming that conversation created a duty on Medco and Express Scripts to correct her misunderstanding about the no-cost plan, the chance to convert the Minnesota Life policy had long since lapsed by that point. As such, she could not have relied on Medco or Express Scripts because their actions occurred after the conversion period lapsed.

Nor is there evidence to suggest Finnegan told the Defendants about her misunderstanding earlier. In her first call to Minnesota Life on June 10, she did not discuss the no-cost option. Sometime after that, she asked Conley for the plan documents but there is no evidence that she explained why she wanted them. In her September 3 call to Minnesota, she mentioned the no-cost plan for the first time, and explained to the representative that she learned about it from her husband, not from anyone at Medco or Express Scripts. And Finnegan confirms this timeline in her deposition. When asked why she believed there was no-cost insurance, she repeatedly pointed to the e-mails with Conley in September and the fact that they helped her fill out the application after that. See Finnegan April 2016 Dep. 127:4-128:10, 152:5-156:16; Finnegan Map 2016 Dep. 26:8-27:12, 42:11-20. Those conversations all post-dated the conversion period.

Finnegan also notes that she never received the ESI Plan documents after the merger in 2012, which suggests that her confusion about the no-cost option could be traced back to that error. There is compelling reason to believe that she did in fact have the documents, given that she called the Express Scripts representative during election season for the ESI Plan and discussed plan pricing listed online compared to the prices listed in "booklet," and since she does not deny that the conversation occurred. But the Court need not resolve that fact issue because it is immaterial. Even if she did not receive the ESI Plan documents after the merger, the Cobra Notice gave her all the information she needed to make a decision about the conversion. The letter told her that her

16

coverage ended when she was fired, so she had no reason to believe she was still eligible for no-cost insurance under the plan. The letter also told her that she had 31 days to change her Minnesota Life group policy to an individual one. As such, given the contents of the Cobra Notice, the dispute over whether she received the ESI plan does not create a genuine issue of material fact.

In sum, based on the sequence of events, no reasonable finder of fact could conclude that Finnegan relied on Defendants' errors when passing on the conversion since their relevant conduct occurred after the chance to convert lapsed. See Shook, 625 F.3d at 73 ("In demonstrating sufficient reliance, the plaintiff must have taken some action as a result of the misrepresentation"); see also Daniels v. Thomas & Betts Corp., 263 F.3d 66, 75 (3d Cir. 2001) ("[Plaintiff] is not entitled to relief unless she can establish that her [injury] was attributable to [her deceased husband's] reliance on the alleged misrepresentations.").

There is another reason why her theory fails. In addition to the conversion window closing before she spoke to Conley, the evidence shows that she chose not to convert because it was too expensive, not because of Medco or Express Scripts' actions. In the June 10 call, when the Minnesota Life representative told Finnegan that the conversion would cost her $3,837.25 per quarter (i.e., $15,349.00 per year), she responded, "I can honestly say that isn't going to happen." She also considered the quote laughable because it was "an exorbitant amount of money," "not financially feasible," and "beyond [her] financial means . . . ." See also Pyrich Decl. Ex. 3, Response to Interrogatories 8 ("[B]ased on her understanding at the time, the price stated for continuing / converting her existing life insurance benefit was exorbitant and beyond her ability to afford."), ECF No. 54-3. And nothing in her deposition suggests she meant these statements in a comparative sense. She has provided no evidence, for example, that although the conversion was expensive and undesirable, it was still a viable option; or that she could have found a way to make

the "exorbitant" payments work. Instead, she stated in plain terms that she could not pay that much money per quarter. Finnegan's statements thus establish that her decision to forego the conversion was attributable to personal finances, not Medco or Express Scripts.

In a subsequent declaration, Finnegan changed her reasons somewhat. She suggested the conversion cost was too expensive *compared to* no-cost insurance. See Finnegan Decl. ¶ 25 ("Not only was this amount more than I could afford, it seemed unnecessarily high given that I understood that I had life insurance from my employer, at no cost to me, for as long as I was disabled, due to the 'premium waiver' provision in the 2012 SPD."). Her explanation is questionable. The purpose of it is to establish a nexus between the no-cost insurance and her decision to forgo conversion. The problem, however, is that it cannot be reconciled with the reasons she gave in her deposition testimony or the timeline established by her documentary evidence. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 254 (3d Cir. 2007) (Courts may disregard a subsequent affidavit that contradicts prior deposition testimony so long as there is no "independent evidence in the record to bolster an otherwise questionable affidavit . . . .") (citation and quotes omitted). As explained, her deposition testimony established that the quarterly price was more than she could afford. There was no discussion of no-cost insurance during the June 3 call. She now maintains that no-cost insurance was on her mind at that time. But it is unclear how that could be given that she did know about it until later. She did not mention no-cost insurance to anyone until the September 3 call to Minnesota Life, and even then she explained that she learned about it from her husband, not from any plan document. And she did not receive the 2012 Medco SPD, which explained the no-cost option, until Conley e-mailed it to her in mid-

18

September.[7]  Both of these interactions occurred after the 31-day window that closed in May, so her assertion that she considered the conversion option too expensive *compared to* the no-cost plan is not possible.  As such, her statement does not create a dispute of material fact over whether the high cost of the conversion was the only reason for her decision.

The Court turns to Finnegan's final theory—i.e., even though she has some coverage now, she would have ended up with better coverage but for her pursuit of no-cost insurance.  Finnegan explains it as follows:  Because she pursued illusory no-cost insurance for long, she had to find "other options to replace the nearly $750,000 in life insurance she had previously had under the Medco Plan.  She has not been able to do so.  Instead, she has managed only a partial replacement, at significant cost to her."  Finnegan Br. 23.

Her evidence does not support this theory either.  Finnegan explains in detail her failed attempts to find equal replacement coverage:  Her graduate school plan deemed her a health risk, Prudential offered her a private plan for $250,000, Fidelity offered her a plan for $150,000, and her brokers could not find any other coverage.  See Finnegan Decl. ¶¶ 43-48.  But she has not shown that she would have been in a different position but for Medco or Express Scripts' acts.  For example, there is no indication that her graduate school insurer would not have deemed her a health risk if she applied in April 2013 instead of fall 2013; that Prudential's personal policy would cover her for more than $250,000 if she applied for it sooner than February 2014; or that her brokers would have found more coverage for her.  That means her pursuit of no-cost insurance did not

---

[7] At certain points in her deposition, she also asserts that she learned about the no-cost option from "Andrea," a Prudential employee.  See Finnegan April Dep. 145:22-146:11.  She does not attach a date to that conversation but admits it was around when she filed the application, which we now know was in September or October 2013.  See id.

affect how much coverage she ended up with. Absent a showing that she was harmed but for the Defendants' actions, there is no violation. See Horvath, 333 F.3d at 462.[8]

## IV. CONCLUSION

For the reasons set forth herein, Defendants' Medco and Express Scripts' motion for summary judgment, ECF No. 47, is **GRANTED** as to all counts. Finnegan's motion for summary judgment, ECF No. 52, is **DENIED**. An appropriate Order accompanies this opinion.

**Date: July 27, 2017**              */s Madeline Cox Arleo*
                                     **Hon. Madeline Cox Arleo**
                                     **United States District Judge**

---

[8] Usually, plaintiffs in breach of fiduciary duty cases do not have a high bar to establish that they could have obtained alternative coverage but for the misrepresentation. While plaintiffs must provide more than conclusory allegations, Smith, 6 F.3d at 137, the Third Circuit has considered evidence that the plaintiff actually discussed or pursued alternative coverage sufficient, see, e.g., Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 237 (3d Cir. 1994). But here, Finnegan has foreclosed that theory. She has provided considerable evidence that there were no more coverage options available to her beyond what she has now. See Finnegan Decl. ¶¶ 42-48. And she has only provided conclusory allegations in her brief to support her assertion that she could have obtained more.